JUDGMENT

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

NO. 99-10071 -PCT-
CT/AG#: CR-995-00448-RGS

X FILED ___ LODGED
___ RECEIVED ___ COPY
APR 12 2001
CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY ___ DEPUTY

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

MARK C. ALBERS; JIM T. FREEGARD; DAVID W. MORAN; ERIN MORAN; DAVID PIERCE; CARMEL PRESSE; J. LYLE PRESSE; JEFF SCHABS; MARK SHEEHAN; KIRK SMITH; DAVID M. STROBEL; STEVE VAN HORN

Defendants - Appellants

APPEAL FROM the United States District Court for the District of Arizona (Phoenix).

THIS CAUSE came on to be heard on the Transcript of the Record from the United States District Court for the District of Arizona (Phoenix) and was duly submitted.

ON CONSIDERATION WHEREOF, It is now here ordered and adjudged by this Court, that the judgment of the said District Court in this cause be, and hereby is AFFIRMED.

Filed and entered September 7,2000

A TRUE COPY
CATHY A. CATTERSON
Clerk of Court
ATTEST

OCT - 4 2000

by: Jane Cross
Deputy Clerk

157

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MARK C. ALBERS; JIM T. FREEGARD; DAVID W. MORAN; ERIN MORAN; DAVID PIERCE; CARMEL PRESSE; J. LYLE PRESSE; JEFF SCHLABS; MARK SHEEHAN; KIRK SMITH; DAVID M. STROBEL; STEVE VAN HORN,
*Defendants-Appellants.*

No. 99-10071

D.C. No. CR-95-00448-RGS

OPINION and ORDER DENYING THE PETITION FOR REHEARING

Appeal from the United States District Court
for the District of Arizona
Roger G. Strand, District Judge, Presiding

Argued and Submitted
February 7, 2000—San Francisco, California

Filed September 7, 2000

Before: Procter Hug, Jr., Chief Judge, Dorothy W. Nelson, and M. Margaret McKeown, Circuit Judges.

Opinion by Judge D.W. Nelson

## SUMMARY

### Criminal Law and Procedure/Criminal Acts

The court of appeals affirmed judgments of conviction. The court held that ram-air chutes used by individuals jumping

from structures in national parks are parachutes for purposes of federal regulations.

National Park Service rangers arrested appellant Mark Albers and eleven others for BASE jumping in a national park, the Glen Canyon National Recreation Area. The government charged the defendants under federal regulations with delivering and retrieving persons by parachute and disorderly conduct. The district court found the defendants guilty of both counts. BASE jumping is an extreme sport in which enthusiasts jump from structures with the use of a chute.

The defendants appealed, arguing that the delivery regulation was vague and that the chutes used by the defendants were powerless flight devices which the federal regulations permitted the operation of on designated lands and waters; and, the FAA had authority of the matter.

**[1]** The Park Service proscribes BASE jumping under its regulations governing aircraft and air delivery. The provisions prohibit delivering or retrieving a person or object by parachute, helicopter, or other airborne means, except in emergencies involving public safety or serious property loss, or pursuant to the terms and conditions of a permit.

**[2]** The chutes used by the defendants, although technologically sophisticated, were still parachutes. **[3]** The functional purposes of the BASE jumpers' ram-air parachutes identified by the defendants' expert witness were consistent with the term "parachute" as defined in the federal regulations: a device used or intended to be used to retard the fall of a body or object through the air. **[4]** BASE jumping did not qualify as powerless flight.

**[5]** The FAA has jurisdiction to develop plans and policy for the use of the navigable airspace and assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace. With respect to the



landing of ram-air chutes in national parks, however, the FAA does not have exclusive jurisdiction and nothing precluded the Department of Interior from promulgating regulations to prohibit such landings.

**[6]** The relevant inquiry in finding recklessness was whether the defendants deliberately disregarded a substantial and unjustifiable risk of creating a hazardous or physically offensive condition of which they were aware.

**[7]** BASE jumping in a national recreation area was likely to affect persons in a place to which the public or a substantial group has access, and **[8]** could create a risk of harm to the public.

---

## COUNSEL

Fred M. Morelli, Jr., Aurora, Illinois, for the defendants-appellants.

Camille D. Bibles, Assistant United States Attorney, Phoenix, Arizona, for the plaintiff-appellee.

---

## ORDER

The opinion filed on July 17, 2000 is hereby WITHDRAWN.

SO ORDERED.

---

## OPINION

D.W. NELSON, Circuit Judge:

National Park Service rangers arrested Mark Albers and eleven others (collectively "Albers" or "the defendants") for

BASE jumping in the Glen Canyon National Recreation Area. The government charged the defendants with delivering and retrieving persons by parachute, in violation of 36 C.F.R § 2.17(a)(3), and disorderly conduct, in violation of 36 C.F.R. § 2.34(a)(4). Subsequent to a bench trial, the district court found the defendants guilty of both counts. We affirm.

## *FACTUAL AND PROCEDURAL BACKGROUND*

The acronym in BASE jumping refers to the structures off of which enthusiasts of the extreme sport jump with the use of a chute: Buildings, Antennas (radio and television towers), Spans (bridges), and Earth (cliffs). BASE jumpers have leapt from the Empire State Building, the Eiffel Tower, Angel Falls in Venezuela (the highest waterfall in the world), the 98-foot Christ statue in Rio de Janeiro, and the World Trade Center. While the United States Parachute Association recommends that skydivers open their parachutes at a minimum elevation of 2,000 feet, most BASE jumps are made from 1,000 feet or less. *See* Ellen Lord, *Parachutist's Death Revives Debate Over Daredevil Jumps*, Cincinnati Post, Oct. 27, 1999, at 10A. BASE jumping has one of the sporting world's highest fatality rates with over 45 jumpers having died in its 18-year history. *See* Karl Taro Greenfield, *Life on the Edge*, Time Mag., Sept. 6, 1999, *available in* 1999 WL 25725124.

On May 1, 1995, Park Service Ranger Chris Cessna received word that a group of individuals were BASE jumping at Lake Powell in the Navajo Canyon area of Glen Canyon. BASE jumping is prohibited in Glen Canyon, as it is in all other national parks with the exception of the New River Gorge National Park.[1] Upon reaching the Navajo Canyon,

[1]BASE jumping from the 870-foot New River Gorge Bridge began shortly after it opened in 1977 and several years prior to the area being designated as a national park. The Park Service, after taking possession of the river under the bridge, granted permission for BASE jumpers to leap from the bridge on the third Saturday of each October. *See The National Parks: Thrilled to Death*, The Economist, Nov. 13, 1999, *available in* 1999 WL 29811476.



Ranger Cessna saw a houseboat at the base of the canyon wall; a 100-foot climbing rope was anchored from the rim of a 400-foot cliffs section. The ranger, seeing several of the defendants on the boat with items associated with BASE jumping, such as knee pads and Protec helmets, climbed on board to investigate. While Ranger Cessna was inspecting the houseboat, other defendants, also carrying BASE jumping gear, approached in a motorboat. A second ranger, Phil Hibbs, located additional BASE jumpers and their gear on the shoreline of Lake Powell. No other boats were in the area.

The government charged the defendants with two counts: (1) air delivery without a permit in violation of 36 C.F.R § 2.17(a)(3); and (2) disorderly conduct in violation of 36 C.F.R. § 2.34(a)(4). The defendants, asserting that BASE jumping is a type of powerless flight permitted under 36 C.F.R. § 2.17(a)(1), moved to dismiss under Fed. R. Crim. P. 12(b)(2);[2] the district court denied the motion on October 10, 1996. The defendants also filed motions to suppress evidence and their statements. The district court determined that film and videotape found on the houseboat should be suppressed and also granted the motion to suppress the defendants' statements. On appeal, this court reversed the district court order suppressing the evidence and remanded the matter for trial. *See United States v. Albers*, 136 F.3d 670, 674 (9th Cir. 1998). Finally, the defendants, arguing that the Park Service's jurisdiction to prohibit air delivery on Lake Powell is preempted by the Federal Aviation Administration ("FAA"), filed a second motion to dismiss. On August 11, 1998, the district court denied this motion.

The bench trial commenced on September 4, 1997, at the end of which the district court found the defendants guilty of both counts charged. The judge sentenced each defendant to pay a fine of $500, $345.23 for the cost of the prosecution,

[2]Fed. R. Crim. P. 12(b) requires that "[d]efenses and objections based on defects in the indictment or information . . ." be raised prior to trial.

and a $20 special assessment fee. The defendants timely appealed.

## *DISCUSSION*

### I

**[1]** The Park Service proscribes BASE jumping under its regulations governing aircraft and air delivery. *See* 36 C.F.R. § 2.17. The relevant provision prohibits "[d]elivering or retrieving a person or object by parachute, helicopter, or other airborne means, except in emergencies involving public safety or serious property loss, or pursuant to the terms and conditions of a permit." 36 C.F.R. § 2.17(a)(3). We give substantial deference to the Park Service's interpretation of this regulation, *see Department of Health and Human Servs. v. Chater*, 163 F.3d 1129, 1133 (9th Cir. 1998), "unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.' " *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (quoting *Gardebring v. Jenkins*, 485 U.S. 415, 430 (1988)).

**[2]** Most significantly, Albers argues that § 2.17(a)(3) is ambiguous as the "ram-air aeroelastic wings" used by the defendants are a type of aircraft and a preceding provision, § 2.17(a)(1), permits the "operating or using [of] aircraft" on designated lands and waters. Whether a regulation is unconstitutionally vague is a question of law subject to de novo review. *See United States v. Erickson*, 75 F.3d 470, 475 (9th Cir. 1996). In arguing that the defendants' chutes are aircraft, "a device that is used or intended to be used for human flight in the air, including powerless flight," 36 C.F.R. § 1.4(a), and not parachutes, Albers relies on the sophisticated technology of the equipment: a "rectangular shaped ram-air aeroelastic wing . . . made of cloth with cross-sewn shaped fabric ribs designed with the aerodynamic characteristics of an aircraft



wing intended for maneuverable powerless flight through the air . . . ." Albers also emphasizes its versatility:

> [T]he rectangular shaped ram-air aeroelastic wing used by Defendants can be fitted with a gondola, powered with a fan and flown through the air; or it can be fitted with a frame like a hang glider or equipped with a harness; and is maneuverable and can be steered around trees and other objects; and can be used in downhill runs to avoid pylons similar to downhill skiing slalom.

Despite the equipment's impressive characteristics, the Tenth Circuit, the only other circuit to have addressed this question, held that "[t]echnological improvements in the shape, maneuverability, and control of modern parachutes, including those used here, do not make them cease to be parachutes." *United States v. Oxx*, 127 F.3d 1277, 1279 (10th Cir. 1997). We agree and we also think that ordinary people would find that the chutes, although technologically sophisticated, are still parachutes. *See Erickson*, 75 F.3d at 475 (holding that a regulation is not unconstitutionally vague if it is capable of a limited interpretation such that ordinary people could understand what conduct is prohibited and those enforcing it are provided with clear standards).

**[3]** Our determination here is supported by the defendants' own expert witness, Adam Filippino. In his testimony, Filippino, a manufacturer of BASE jumping equipment, described the defendants' gear as "ram air parachute[s]" and characterized both the ram-air and round parachutes as "types of parachute." He also identified two functional purposes of the BASE jumpers' ram-air parachutes: (1) "to slow [the jumper's] rate of descent to avoid dying at the bottom," and (2) "to cover the distance between where you open and where the boat is waiting for you." These purposes are consistent with the term "parachute" as defined in the federal regulations: "a

device used or intended to be used to retard the fall of a body or object through the air." 14 C.F.R. § 1.1.

**[4]** Given that the ram-air chutes used by the defendants are parachutes, BASE jumping does not qualify as powerless flight. Albers' contention that the National Park Service has defined powerless flight devices, a class of aircraft, to include parachutes is at odds with the regulatory history of § 2.17(a)(3). In 1975, the Department of Interior proposed a definition of powerless flight which included "[t]he launching or landing of recreational gliders, sailplanes, *parachutes*, body kites, hang gliders, and other devices designed to carry persons or objects through the air . . ." 40 Fed. Reg. 36,378 (1975) (emphasis added). The final regulation, however, omitted reference to parachutes. *See* 40 Fed. Reg. 57,695 (1975); *see also* 48 Fed. Reg. 30,258, 30,268 (1983). We defer to the agency's interpretation of this omission and read the final regulation as excluding parachutes from the category of powerless flight devices.

Finally, Albers contends that the term "delivery" as used in the prohibition under § 2.17(a)(3) against "[d]elivering or retrieving a person or object by parachute . . ." is generally understood as the "giving, handing over or transfer from one person to another." In other words, Albers, reasoning that delivery "is usually construed to include more than one person," maintains that the defendants cannot be convicted under § 2.17(a)(3) for an activity which involves pushing oneself off structures. We decline to define the term to exempt self-delivery and choose instead to adopt the Tenth Circuit's determination that "moving oneself from one area to another, as defendants did, constitutes delivery." *Oxx*, 127 F.3d at 1279.

We acknowledge that the regulation of BASE jumping under § 2.17(a)(3) is not the most organic fit. Because of the deference owed to an agency's interpretation of its regulations, however, we conclude that BASE jumping is prohibited under § 2.17(a)(3). The ram-air chutes used by the defendants to BASE jump are a type of parachute and do not therefore meet the regulatory definition of aircraft as a form of powerless flight.



## II

**[5]** In accordance with their argument that ram-air parachutes qualify as aircraft, the defendants assert that the FAA has authority over this matter as it has exclusive jurisdiction over the airspace above, and surface of, Lake Powell. The FAA Administrator has jurisdiction to "develop plans and policy for the use of the navigable airspace and assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace." 49 U.S.C. § 40103(b)(1) (1996). With respect to the landing of ram-air chutes in national parks, however, the FAA does not have exclusive jurisdiction and nothing precludes the Department of Interior from, as here, promulgating regulations to prohibit such landings. *See* 16 U.S.C. § 3 (1992); 36 C.F.R. § 770(a)(6).

## III

The district court, determining that the defendants recklessly created a risk of harm to themselves and to members of the public, convicted them of disorderly conduct under 36 C.F.R. § 2.34(a)(4):

> A person commits disorderly conduct when, with intent to cause public alarm, nuisance, jeopardy or violence, or knowingly or recklessly creating a risk thereof, such person . . . [c]reates or maintains a hazardous or physically offensive condition.

On appeal, Albers argues the defendants cannot be convicted of disorderly conduct as no member of the public was alarmed, disturbed, or offended by their BASE jumping activities. We review the district court's interpretation of

§ 2.34(a)(4) de novo. *See United States v. Hoff*, 22 F.3d 222, 223 (9th Cir. 1994). When considering the sufficiency of evidence to support a conviction, we review the record in the light most favorable to the government to determine whether a rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *See id.* at 224.

**[6]** A conviction under § 2.34(a)(4) is uncommon; only one federal court has addressed its contours. *See United States v. Carroll*, 813 F. Supp. 698, 704-05 (E.D. Mo. 1993). We therefore find it useful to first define the germane terms contained in the regulatory provision. The government claims that the defendants recklessly engaged in BASE jumping so we begin by construing the meaning of the term "recklessly." Because the statute does not define "recklessly," we must derive the meaning of the term from other sources. *See United States v. Karlic*, 997 F.2d 564, 569 (9th Cir. 1993). In *Karlic*, we consulted the Model Penal Code to divine the meaning of "knowingly" and "recklessly" under the Sentencing Guidelines, which do not define either term. *See id.* Accordingly, we find it useful here to refer to the Model Penal Code's definition of "recklessly" by way of analogy:

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

Model Penal Code § 2.02(2)(c) (1985). The Supreme Court has, moreover, explained that the criminal law generally permits a finding of recklessness only when persons disregard a risk of harm of which they are aware. *See Farmer v. Brennan*,



511 U.S. 825, 836-37 (1994). We thus conclude that the relevant inquiry in finding recklessness here is whether the defendants deliberately disregarded a substantial and unjustifiable risk of creating a hazardous or physically offensive condition of which they were aware.

**[7]** We must next give meaning to the term "public," which is not defined in § 2.34(a)(4). We again find it useful to consult the Model Penal Code, which defines "public" as "affecting or likely to affect persons in a place to which the public or a substantial group has access . . . ." Model Penal Code § 250.2(1) (1962). BASE jumping in a national recreation area certainly satisfies the latter portion of the definition for, as Justice Roberts has noted, "parks . . . have immemorially been held in trust for the use of the public . . ." *Hague v. Committee for Indus. Org.*, 307 U.S. 496, 515 (1939) (Roberts, J., concurring)). The more difficult question is whether the defendants' BASE jumping activities affected or were likely to affect others.

**[8]** The safety threat implicated in BASE jumping is most often the potential harm to the jumper due to the fatalities and injuries characterizing the extreme sport. We do not, however, discount the safety risks of BASE jumping posed to members of the public, particularly in areas where people are likely to congregate. *See Carroll*, 813 F.Supp. at 704 (finding that BASE jumping from the St. Louis Arch, which is located in the eastern part of downtown St. Louis, was hazardous to those on the ground). The appellants respond by arguing that they were jumping in a remote part of Glen Canyon. The evidence shows, though, that there were occasionally other boats in the area. The risk of harm to those on the boats is real as one of the defendants here collided into the BASE jumpers' houseboat. Visitors to the national park, moreover, have no reason to be on guard for BASE jumpers as they might for those taking part in activities which are permitted such as rock climbing or hang gliding. We therefore affirm the district court's determination that BASE jumping can create a risk of

harm to the public and defer to the courts' evidentiary findings. *See Hoff*, 22 F.3d at 224.

With this opinion, the appellants' Petition For Rehearing is otherwise denied.

**AFFIRMED.**